TECHE LINES, INC., *v.* DANFORTH *et al.*

(In Banc.   April 5, 1943.)

[12 So. (2d) 784.   No. 35252.]

George W. Currie, of Hattiesburg, for appellant.

230

232

Currie & Currie, of Hattiesburg, for appellees.

236

Stevens & Stevens, of Jackson, amicus curiae.

**Currie & Currie,** of Hattiesburg, for appellees, in reply to the brief of **Stevens & Stevens,** amicus curiae.

244

246

**Griffith, J.**, delivered the opinion of the court.

This case involves the proper and permissible interpretation of Sec. 90, Chap. 200, Laws 1938, known as the uniform highway traffic regulation act. This section reads as follows:

"(a) Upon any highway outside of a business or residence district no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main traveled part of the highway when it is practical to stop, park, or so leave such vehicle off such part of said highway, but in every event a clear and unobstructed width of at least 20 feet of such part

of the highway opposite such standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicle be available from a distance of 200 feet in each direction upon such highway.

"(b) This section shall not apply to the driver of any vehicle which is disabled while on the paved or improved or main traveled portion of a highway in such manner and to such extent that it is impossible to avoid stopping and temporarily leaving such disabled vehicle in such position."

The facts, so far as material to the point to which we shall confine this opinion and decision, are that appellant is an authorized carrier of passengers by motor bus, and on the occasion in question stopped its bus to let off a passenger in pursuance of its established custom and duty in such cases. The pavement of the highway was 20 feet wide, and according to the overwhelming weight of the evidence the shoulders on each side were about 3½ feet wide, making a total width of 27 feet. The stop was made about halfway down an incline approximately 1100 feet long. The bus was about eight feet wide, so that when some room was left to the passenger to alight on the shoulder, and not in the ditch, it was impossible to leave 20 feet clearance opposite the bus. While the passenger was making his way out of the bus, appellee's decedent ran into the rear of the bus and suffered injuries from which he died.

The trial court granted appellees the following instructions:

"The Court instructs the jury for the plaintiffs that if you believe from the testimony in the case, that the bus of the defendant was stopped upon the paved or improved or main traveled part of Highway 11, not in an emergency, at a place and time and in such way as not to leave a clear and unobstructed width of at least 20 feet of such part of the highway opposite such standing bus or vehicle, then such stopping of said bus or vehicle at such time and place, and under such condition, if you be-

lieve it was so parked, was a violation of the law and negligence, and if you further believe from the testimony that such negligence, if any, proximately caused or contributed to the injury and death of the deceased, then the defendant is liable, and it is your duty to find and return a verdict for the plaintiffs.''

The quoted instruction, as may be readily seen, amounts to a peremptory charge in favor of the plaintiff. It tells the jury that if less than 20 feet clearance was left by the bus, this was negligence. The instruction did not permit the jury to say whether it was possible or practical to leave that much, and, as a matter of fact, by the overwhelming evidence, as already stated, it was not even possible much less practicable. It did not permit the jury to say whether the bus was stopped as far to the right on the highway as was possible, and at the same time safe, considering the high degree of care which the bus driver owed to the passengers, including the one then about to alight.

The central principle which runs through all the cases dealing with statutes regulatory of highway traffic is that such statutes must have a practical or workable interpretation, not an arbitrary or unreasonable construction, and never that which would require an impossibility; and this has been the rule from the earliest enactments of such statutes down to this day. We do not prolong this opinion by going into a review of pertinent cases from other states. Hundreds of them are cited and annotated in the elaborate note found in 131 A. L. R., pp. 562 to 607, among which we might mention Kelly v. Locke, 186 Ga. 620, 198 S. E. 754, as particularly persuasive. No case has been cited by appellee, nor have we found any, which under its particular facts would sustain the quoted instruction under facts such as are presented by the record here before us. Even the Minnesota case, Ball v. Gessner, 185 Minn. 105, 240 N. W. 100, of which so much has been made, and which is inaccurately annotated in Vol. 11, Uniform Laws Annotated, at page 48, does not under its

facts or under all the language used by the court sustain any such technical interpretation of the statute, or any such hard and fast instruction as was given to the jury in the case at bar. Ball v. Gessner, supra, did not involve a vehicle temporarily stopped for a legitimate or necessary purpose as an incident to travel, but there the truck was parked in the road while the driver was holding a ten-minute conversation with a person over on a roadside farm. As the facts show, and as we shall later mention, we are not dealing in the present case with a parked vehicle.

And we do not need to go to other states for the principle which is to be applied. In Boyd v. Coleman, 146 Miss. 449, 111 So. 600, there was the case where damages were claimed for the non-issuance of automobile tags during the month of December, as required by statute. The defense was that no tags were available during that month and that it had been impossible to obtain them until January 6th. The court held that although plainly there had been a technical violation of the statute it was not actionable because of the impossibility of compliance therewith. The court said: ''The law does not require doing of an impossible thing, and statutes should not be construed to require performance of duties which are rendered impossible of performance by reason of causes for which person is in no way responsible and powerless to change or remove.'' And the court said further, and in language which precisely fits this case: ''All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the Legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter. . . . It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. . . .

This is not a substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include the act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the Legislature intended to include the particular act.'' See, also, Byrd v. Byrd, 193 Miss. 249, 8 So. (2d) 510, 512.

In one of our latest cases, Zeigler v. Zeigler, 174 Miss. 302, 303, 310, 164 So. 768, citing numeous other cases in this state it was held that unthought-of results or those which would lead to absurdity will be avoided in the interpretation of statutes, although within the technical terms of the statute, if possible to find a reasonable construction which will avoid such results.

While admitting, as must be admitted, that impossibilities are not required by any statute whatever its subject, it has been argued that when impossible to stop so as to leave as much as 20 feet clearance, the vehicle must keep going until a place may be found where the required clearance can be left, and that argument has proceeded so far as to say that if this require a going forward of ten miles or even farther, this must be done or else the statute would be violated.

This court may, and it is its duty to, take judicial knowledge of what everyone knows who has been beyond his own door sill, that at least 85% of the public highways of this state are of such width that it is only occasionally possible, and this often at distant intervals, to stop a vehicle so as to leave as much as twenty feet of unobstructed highway to the side of the vehicle. To give the statute in question the literal or hard and fast construction for which appellees contend would lead to unthought of and absurd consequences, which every experienced member of the legislature would be bound to disclaim as ever having been in his mind as a deliberate conclusion. It is

enough to say of this that if such a construction could be sustained and enforced, it would dislocate and put out of business the rural mail delivery service on not less than 75% of the rural routes in the state, and a husband could not pick up his wife trudging homeward from the rural grocery store in the rain, or even to attend to a wounded or sick person found on the roadside.

Illustrations of the absurdity could be extended almost without limit; but we pursue this branch of the discussion no further than to quote from the opinion in Colvin v. Auto Interurban Co., 132 Wash. 591, 598, 232 P. 365, 368, wherein the court said: "We know that on many of our highways one would be required to run his automobile mile upon mile before a place could be found where the machine could be entirely removed from the pavement. The statute must be given a reasonable and workable construction. If there is proper excuse or necessity for stopping the car, it will be sufficient, if a reasonable effort be made to get it entirely off the main traveled portion of the road, or as nearly so as the circumstances will permit."

Aside from absurdity or unthought of consequences, we may advance a step, and a very vital step, further, and to the following inescapable consideration: "The right of a citizen to travel upon the public highways and to transport his property thereon in the ordinary course of life and business is a common right which he has under his right to enjoy life and liberty, to acquire and possess property, and to pursue happiness and safety. It includes the right in so doing to use the ordinary and usual conveyances of the day; and under the existing modes of travel includes the right to drive a horse-drawn carriage or wagon thereon, or to operate an automobile thereon, for the usual and ordinary purposes of life and business." Thompson v. Smith, 155 Va. 367, 154 S. E. 579, 583, 71 A. L. R. 604, 610. There seems to be no dissent among the authorities on this proposition. See 11 Am. Jur. Constitutional Law, Sec. 329, p. 1135, and the language

of the court in Pinkerton v. Verberg, 78 Mich. 573, 44 N. W. 579, 7 L. R. A. 507, 18 Am. St. Rep. 473.

The right to travel means, of course, the right to go from one place to another. It includes the right (1) to start, (2) to go forward on the way, and (3) to stop when the traveler's destination has been reached. To speak to the first two of these as fundamental rights without including the third would be to descend again to the absurd, and so far as the instant case is concerned that is what we have here. But we do not so limit the right. We affirm that it includes the right to stop on the way, temporarily, for a legitimate or necessary purpose when that purpose is an immediate incident to travel. So it is that the texts and authorities declare that the right to stop when the occasion demands is an incident to the right to travel, a proposition so completely self-evident that no authority is necessary to sustain it, and which we would pronounce irrefutable, had it never heretofore been mentioned. But here are some of the authorities which do declare and sustain it. 2 Blashfield Automobile Law, Perm. Ed., sec. 1191, p. 321; Fulton v. Chouteau County Farmers' Co., 98 Mont. 48, 37 P. (2d) 1025; Morton v. Mooney, 97 Mont. 1, 33 P. (2d) 262, 263; Albrecht v. Waterloo Const. Co., 218 Iowa, 1205, 257 N. W. 183. When, then, the right to stop is arbitrarily or unreasonably restricted or cut off by statutory enactment, the statute is as objectionable from a constitutional standpoint as had the enactment prevented going forward.

The rights aforesaid, being fundamental, are constitutional rights, and while the exercise thereof may be reasonably regulated by legislative act in pursuance of the police power of the state, and although those powers are broad, they do not rise above those privileges which are imbedded in the constitutional structure. The police power cannot justify the enactment of any law which amounts to an arbitrary and unwarranted interference with, or unreasonable restriction on, those rights of the

citizen which are fundamental. State v. Armstead, 103 Miss. 790, 799, 60 So. 778, Ann. Cas. 1915B, 495.

Since, as already mentioned, this court must take judicial knowledge of what everybody knows, namely, that at least 85% of the public highways in this state are of such width that it is only occasionally possible, and this at distant intervals, to stop a vehicle so as to leave as much as twenty feet of unobstructed highway, which would mean that over long stetches of our public roads no vehicle could stop without violating the law, if that clause in the statute which requires that in any event twenty-foot clearance shall be left is to be enforced according to its literal terms, detached from the remainder of the statute, the result would be an unreasonable and arbitrary abridgment of the right to travel, thus rendering the statute unconstitutional when so interpreted, and to the extent so interpreted.

The rule is without exception that when the court is confronted with a statute a literal construction of which would render it unconstitutional, the court must adopt such a construction, when reasonably possible, as will save the statute, and at the same time save every savable provision or term in it. This can be done as to this statute by giving the word "practical" in subsection (a) an operation throughout the entire section, and by preserving as referable to the words, "in any event," the provision that, when possible, a clear view for 200 feet shall be available. It is reasonable to require a vehicle to go forward so that a clear view of it for 200 feet may be available, if possible to do so, while it would be arbitrary and unreasonable to require it to keep going whatever the distance might be, until a twenty-foot clearance could be had. And if a vehicle gives all the clearance it possibly can, and at the same time a clear view of its position for 200 feet, if possible, this is a reasonable and adequate provision for safety, requiring nothing arbitrary, whereas to say that regardless of the view of 200 or even 500 feet, the clearance of the side must, in any event, be twenty

feet, is unreasonable and arbitrary as applied to the public road situation in this state.

It has been suggested that to save the statute from collision with constitutional fundamentals we should, instead of the construction which we are adopting, rewrite the section in question so that it will include only busses and other vehicles using the highways for hire, leaving all others free from the provisions of the section. There are several answers to this, but one is enough. To each vehicle operated for hire there are more than a thousand owned and operated privately. To free a thousand in order to hold one would indeed be an eccentric judicial operation. To use a homely illustration, it would be to cut off the tail and hold firmly to that, while letting the animal go. We can impute no such intention to the statute. Plainly it applies to all vehicles—busses, trucks, automobiles, buggies and wagons. Rather than resort to the stated suggestion, it would be more reasonable to read the term ''stop'' as having substantially the same meaning as its associated terms, ''park, or leave standing;'' but we do not find it necessary to go even so far as that. Rather, we can go along down the statute as a whole, and say that it was intended to have an arbitrary or unreasonable construction when applied to any and all vehicles, and applying it also to stopping; and that is what the courts have said in case after case which has arisen under this statute in other states which have it, or similar enactments.

Our ruling is that when twenty feet of clearance is impossible, the vehicle shall turn as far to the right as practical including sound and safe shoulders, but must not stop upon any part of the traveled highway unless and until at least 200 feet clear view is available in each direction from the point where the stop is made, save when the vehicle is disabled, as provided for under subsection (b); and save, further, when on account of obstructions or equivalent conditions ahead, it is impossible to proceed so as to leave the 200 feet of clear view; and that all this

is for the determination of the jury, instead of being taken away from them, as was done here.

We pretermit all other questions raised in this case. We have preferred to confine this opinion to the one issue presented by the quoted instruction and the error therein. And it must be noted that we have not decided anything about the parking of vehicles or leaving them standing. Nor anything about the feature mentioned in Kelly v. Locke, supra, that a driver may be required to go forward to a place where there is an available and safe space, sufficient to allow a compliance with all the literal terms of the statute, if within a reasonably short distance ahead, and if such place be known to, or observable by, the driver in the exercise of a reasonable diligence. The feature mentioned in the foregoing sentence was not submitted to the jury by the quoted instruction, but in fact by the import of the instruction was taken from the jury, even if there had been evidence sufficient to go to the jury on that issue.

Reversed and remanded.

**Anderson, J.,** delivered a dissenting opinion.

The controlling opinion writes out of the statute the 20-foot provision, as applied (quoting from the opinion) to ''at least 85% of the public highways of this state.'' The statute involved is known as ''the uniform traffic regulation act.'' It has been adopted by many of the states, with differences in some respects, but in most of their provisions they are uniform. The authorities in the briefs show that the courts of some of the states have construed the provisions of the statute involved here. None of them, however, support the holding of the majority opinion.

The state has power, for the safety of the public, to regulate the use of its public highways, and may prohibit or condition, as it deems proper, their use. Where a reduction on their use ''is designed to promote the public convenience and the interest of all, it cannot be disre-

garded by the attempted exercise of some civil right which in other circumstances would be entitled to protection under the Constitution." Cox v. New Hampshire, 312 U. S. 569, 61 S. Ct. 762, 85 L. Ed. 1049, 133 A. L. R. 1396; State v. L. &. N. R. Co., 97 Miss. 35, 51 So. 918, 53 So. 454, Ann. Cas. 1912C, 1150; State v. J. J. Newman Lbr. Co., 102 Miss. 802, 59 So. 923, 45 L. R. A. (N. S.), 851, on suggestion of error, 103 Miss. 263, 60 So. 215, 45 L. R. A. (N. S.), 858. The police power of a state can neither be abdicated nor bargained away. It is inalienable. Atlantic Coast Line R. Co. v. City of Goldsboro, 232 U. S. 548, 34 S. Ct. 364, 58 L. Ed. 721. The power is as broad and plenary as the taxing power. Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 32 L. Ed. 346. The police power of the states embraces the construction of roads, canals and bridges, and the establishment of ferries, and the maintenance of highways. Escanaba & L. M. Transportation Co. v. Chicago, 107 U. S. 678, 2 S. Ct. 185, 27 L. Ed. 442; New Orleans Gas-Light Co. v. Louisiana Light & Heat Co., 115 U. S. 650, 6 S. Ct. 252, 29 L. Ed. 516.

The public records show that more people were killed or maimed in the United States by motor vehicles in 1941, than this country had killed or maimed in the first World War.

There is nothing in the record showing that 85% of the highways of the state would be affected, or, for that matter, any other proportion of the highways. If, however, that be a fact, according to judicial knowledge, we know in the same way there are not a dozen country mail boxes in the state that the mail carrier cannot conveniently approach by parking his car at or near the entrance to the premises being served. Furthermore, it is a matter of common knowledge that stations could be constructed in compliance with the statute, at a little expense.

In considering the application of the statute involved it is necessary to state the case made by the evidence. The controlling opinion does not do that. The collision and injury occurred about 9:30 at night, on paved high-

way No. 11, which runs through the city of Laurel, thence southward through Ellisville, Moselle and Hattiesburg. Clyde Douglas, a negro, was working at Laurel; his home was between Ellisville and Moselle, something like half a mile from the highway in the country. The nearest place on the highway to his home was Brannon's store and residence. The bus company sold tickets to Moselle, but not to Brannon's place. But it was in the habit of stopping to take on and let off passengers at other places along the route where tickets were not sold. Douglas was making that trip on the night of the collision and death of Danforth. As usual he had a ticket to Moselle. It was the custom of the driver of the bus to let him off at Brannon's. As usual, he pushed the buzzer for the bus to stop at that place, but instead of doing so it ran on south, down a decline, something like 350 feet, and stopped to let him off. When the collision occurred the negro was approaching the front to get off. The bus had been standing at that place about two minutes when the collision occurred. Brannon's is at the crest of the hill. There is a considerable decline going south therefrom, of something like 800 to 1,000 feet before reaching level ground. The bus was stopped about half way between these two points. The paved part of the highway is 20 feet wide, with about 3½-foot shoulders on each side, made of gravel and sand. The bus was 8 feet wide and 32 feet long. It was standing with all six wheels on the paved part of the highway, leaving only about 12 feet of paved highway to its left. About 60 feet north, the evidence tends to show, there was a rise or small hill, which obstructed the vision of one driving south from Brannon's. Instead of the front righthand part of Danforth's car striking the bus, the contact was with the righthand door, resulting in part of that side of the car being torn off. The contact with the bus was on its rear lefthand side. It was manifest from the testimony that if Danforth had had a foot or two more of open space he would have passed without collision with the bus. The evidence

tends to show that the statute could have been complied with at a place three or four hundred feet south of where the accident occurred, and also at Moselle, the destination of the passenger. And if the passenger had buzzed the driver of the bus in time it could, and would, have stopped at Brannon's.

And, further, if the driver of the bus had stood on the paved part of the highway, to the left of the bus, which the evidence showed was 10 or 12 feet wide, and waved a red lantern back and forth while his passenger was debarking, and Danforth had seen it, and knowing what it meant, as doubtless he would have, the accident probably would not have occurred.

The statute, in my judgment, is a valid exercise of the police power, both as to public and privately owned motor vehicles. But admit for the sake of argument that it is not as to privately owned cars. That would not necessarily mean that it would be an unconstitutional exercise of the power as to public passenger and freight carriers. A statute may be constitutional in part, and unconstitutional in part. We have here involved a public carrier of passengers. The statute means that such carrier cannot stop at any place on a public highway where its provisions cannot be complied with. In other words, so far as public carriers of passengers and freight are concerned, they must make their own turnouts in order to leave the 20-foot space and 200-foot view each way, unless such turnouts already exist.

I see no reason why the legislature could not prohibit absolutely the use of the improved highways of the state by public carriers of passengers and freight, except in communities not sufficiently served by railroads.

**Smith, C. J.**, concurs in this dissent.

**Smith, C. J.,** delivered a dissenting opinion.

The instruction here under consideration is in complete accord with the statute as written, and, therefore, is correct unless a meaning can be given to the statute, by construction, different from what its words, on their face, imply—in other words, unless the statute can and should be so construed as not to forbid the parking of a vehicle on a highway without leaving opposite it at least twenty feet of the highway's width unobstructed. The rules of construction here invoked for that purpose are: (1) A statute should be given a reasonable construction; and (2) should not be applied here when so to do would lead to a result so absurd and unjust as to manifestly indicate that the legislature did not intend for it to apply thereto.

The first of these rules comes into play when, but not unless, the statute is ambiguously phrased, and then only as an aid in determining which of more than one of its possible meanings should be adopted. Resort may be had to the second of these rules when, but not before, the meaning of the statute under consideration has been ascertained.

The statute is admittedly plain and unambiguous, but a majority of the court say that its prohibition is arbitrary and unreasonable and that, consequently, it should be so interpreted as to remove that defect therefrom—in other words, it should be amended by judicial construction and made to mean something other than it did when it was enacted by the legislature and more in accord with what the court thinks is reasonable and just. I know of no rule of construction that so permits. The meaning which the court says should be given the statute is arrived at by the judicial insertion of the words "if practical" between the words "every event" and the words "a clear," and the insertion of the words "in any event"

between the words "vehicles and" and the words "a clear view."[1]

The statute in clear and apt language positively forbids the stopping or parking of a vehicle on a highway unless both of two things concur: (1) there remains "a clear and unobstructed width of at least 20 feet of such part of the highway opposite such standing vehicle;" and (2) "a clear view of such stopped vehicle be available from a distance of 200 feet in each direction upon such highway." As now amended by judicial construction, it permits parking on a highway without leaving this twenty feet thereof unobstructed when it is impracticable so to do, provided "a clear view of such stopped vehicle be available from a distance of 200 feet in each direction upon such highway." It may be, as to which I express no opinion, that the statute as thus amended is an improvement on what it was when it was enacted, but the making of this improvement, if such it is, is for the legislature, and not for the courts.

But it is said that the right to travel in a vehicle on a highway includes the right to stop the vehicle thereon "temporarily for a legitimate or necessary purpose" and that this statute, as written, would arbitrarily interfere therewith and is, therefore, constitutionally invalid, the section of the Constitution violated not being pointed out. A traveler on a public highway may stop his vehicle temporarily thereon "provided in doing so he exercises reasonable care under the circumstances to avoid injury or damage to other travelers" (25 Am. Jur., Highways, Sec.

---

[1]Clause (a) of the section, as amended, would read as follows: Upon any highway outside of a business or residence district no person shall stop, park or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main traveled part of the highway when it is practical to stop, park, or so leave such vehicle off such part of said highway, but in every event, if practical, a clear and unobstructed width of at least 20 feet of such part of the highway opposite such standing vehicle shall be left for the free passage of other vehicles and, in any event, a clear view of such stopped vehicle be available from a distance of 200 feet in each direction upon such highway.

211), and while he cannot be arbitrarily deprived of the right so to do, its exercise may be regulated by statute. One exercising the right to park a vehicle temporarily on a highway without precaution to prevent injury therefrom to other travelers thereon may be guilty of negligence at common law, although there is a clear view of the parked vehicle for 200 feet in each direction upon such highway. Whether the one who so parked the vehicle is liable to another for injury therefrom depends, at common law and under this statute, on whether this negligence was the proximate cause of the injury, and, in some jurisdictions, but not in this, on whether the negligence of the injured person contributed to the infliction of his injury. This being true, I am unable to perceive how the requirements of this statute can be said to be unreasonable and arbitrary. It is true that it restricts, though not very materially, a common-law right, but such is the usual case with statutes dealing with that law. Moreover, when a traveler complies with the statute he is relieved from taking any further precautions to prevent injury to other travelers on the highway; consequently, the statute would seem to be beneficial rather than detrimental to him. Furthermore, if, as written, the statute violates the Constitution, that fact, the statute being unambiguous, does not authorize the court to amend it by construction so as to bring it in accord with the Constitution. The court's duty in such a case is simply to decline to enforce the statute.

Again it is said that it was impossible for the driver of this bus to park it where he did and leave twenty feet of the highway opposite it unobstructed; and, since no man can be required to do the impossible, the statute should be held not to be here applicable. The defect in this argument is that there was no necessity for the stopping of this bus at this time and place. The appellant is under no duty to stop its busses on the highway other than at places thereon at which it can comply with the law when so doing. Its duty in this connection is to

run its busses according to the schedule approved by the public service commission and to provide regular stations for receiving and discharging passengers at which its busses can stop and remain standing without violating the law. I freely admit that, under an age-old legal maxim, impelling necessity excuses the violation of a statute. Several forms of this maxim appear in 45 C. J. 585, and can be found in any law dictionary. This maxim, however, can afford the appellant no comfort, for the stopping of a vehicle on a highway merely for the convenience of its driver or of another is, of course, not within its protection.

Again it is said that, within the judicial knowledge of this court, "at least 85% of the public highways of this state are of such width that it is only occasionally possible, and this often at distant intervals, to stop a vehicle so as to leave as much as twenty feet of unobstructed highway to the side of the vehicle," from which to enforce the statute, as written, "would lead to unthought of and absurd consequences." I do not know what percent of the public highways are in this condition, and if we can take judicial notice thereof, as to which I express no opinion, the appellee has brought no data, competent or otherwise, to our attention bearing thereon. But if it be true that 85% of the highways are in this condition, that fact cannot change the meaning of the statute, since it is plain and unambiguous, but might affect the validity vel non of the statute as a whole.

One thing this amendment should, but fails to, do, is to advise the traveler on a highway whether he can park his vehicle thereon when so to do would not leave a sufficient, unobstructed width of the highway opposite the parked vehicle for the passage of other vehicles.

I am requested by Justice ANDERSON to say that he concurs in this opinion.